UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SAMUEL NISWONGER, | : | Case No. 3:10-cv-377 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| PNC BANK CORP. & AFFILIATES LONG | : | |
| TERM DISABILITY PLAN, | : | |
| | : | |
| Defendant. | : | |

**DECISION AND ENTRY: (1) GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. 14); (2) DENYING DEFENDANT'S MOTION FOR JUDGMENT (Doc. 13); AND (3) TERMINATING THIS CASE FROM THE DOCKET**

This civil case is before the Court on the parties' cross motions for judgment:

(1) Plaintiff's motion for judgment on the administrative record (Doc. 14);

(2) Defendant's motion to deny Plaintiff's request for relief and to affirm the

administrative decision (Doc. 13); and (3) the parties' responsive memoranda (Docs. 15,

16).

## I.   PROCEDURAL HISTORY AND BACKGROUND FACTS

Plaintiff filed a disability claim with Liberty Life under the policy issued to his

employer based on chest pain, shortness of breath, and anxiety.  Plaintiff's last day of

work was January 10, 2010, due to shortness of breath and anxiety.[1]  (*Id.*, Ex. 2 at 59).

---

[1] At the time of his departure Plaintiff was a "Branch Financial Advisor/Financial Advisor" at PNC Bank, where he had been employed for over 10 years.  Prior to his leaving, Plaintiff's salary and earnings were in excess of $200,000.00 per year.

Defendant approved a short term disability from January 27, 2010 to April 20, 2010, but denied long-term disability, determining that Plaintiff did not meet the definition of disabled under the terms of the Policy.[2]  (*Id.*, Ex. 1).  Defendant maintained that the records and reports from Plaintiff's treating doctors, and the review of these records by a consulting physician,[3] demonstrated sustainable function in a sedentary capacity with restrictions, and a vocational assessment that Plaintiff could perform both his own occupation of financial advisor and any other sedentary-type work.  (*Id.*, Exs. 1 and 2).

Plaintiff filed an administrative appeal, with additional documentation and medical records.  Defendant upheld the denial of Plaintiff's claim in a letter dated October 1, 2010.  (Doc. 11, Ex. 2).  Defendant alleged that the medical records supported restrictions, but did not support disability as defined in the policy, because Plaintiff did not show that the medical issues prevented him from performing sedentary work – either his own occupation or any other occupation.  (*Id.*, Ex. 2 at 63-64).  Specifically, Defendant points to Plaintiff's treating physicians who signed declarations either stating that they had no opinion about whether Plaintiff could work (Dr. Ginn) or that the restrictions did not preclude Plaintiff from work (Dr. Reddy and Dr. Peddanna).  (*Id.*, Ex.

---

[2]  The Policy requires that Plaintiff demonstrate on a continuous basis that he is unable to perform all of the material and substantial duties of his occupation on an active employment basis because of an injury or sickness for an 18-month "own occupation" period.  (Doc. 11, Ex. 4 at 8).

[3]  The consulting physician was Dr. Millstein, who never examined or personally interviewed the Plaintiff.

-2-

2 at 60-61). Based on the totality of information, Defendant determined that Plaintiff was not disabled under the Policy and denied his appeal.[4] (*Id.*, Ex. 2). Plaintiff now appeals to this Court under ERISA.

## II.  STANDARD OF REVIEW

The Court reviews *de novo* a denial of benefits under an ERISA plan "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Univ. Hosps. v. Emerson Elec. Co.,* 202 F.3d 839, 845 (6th Cir. 2000).  If an administrator has such discretionary authority, the Court reviews the denial of benefits under the arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111 (1989).

The arbitrary and capricious standard applies in the present case because the long term disability insurance policy at issue gives Defendant the "sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder.  Defendant's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." (Doc. 11, Ex. 3 at 32).  "When a plan administrator has

---

[4] The Disability Income Policy states:
> i. If the Covered Person is eligible for the 18 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period and the next 18 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and
> ii. Thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

(Doc. 11 at 59).

discretionary authority to determine benefits, [the Court] will review a decision to deny

benefits under 'the highly deferential arbitrary and capricious standard of review.'"

*Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir. 2001) (quoting *Yeager v.*

*Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir. 1996)).

Nonetheless, as noted by the Sixth Circuit, merely because the review is

deferential does not mean that it is inconsequential. *Moon v. UNUM Provident Corp.,*

405 F.3d 373, 378-79 (6th Cir. 2005). As the appellate court explained:

> While a benefits plan may vest discretion in the plan administrator,
> the federal courts do not sit in review of the administrator's
> decisions only for the purpose of rubber-stamping those decisions.
> As we observed recently, "[t]he arbitrary-and-capricious . . .
> standard does not require us merely to rubber stamp the
> administrator's decision." *Jones v. Metro. Life Ins. Co.*, 385 F.3d
> 654, 661 (6th Cir. 2004) (citing *McDonald v. Western-S. Life Ins.*
> *Co.*, 347 F.3d 161, 172 (6th Cir. 2003)). Indeed, '[d]eferential
> review is not no review, and deference need not be abject."
> *McDonald*, 347 F.3d at 172. Our task at all events is to "review
> the quantity and quality of the medical evidence and the opinions
> on both sides of the issues.

*Id.* Only if the administrative record supports a "reasoned explanation" for the

termination of benefits, will the decision be upheld as not arbitrary or capricious.

*Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000) (cited in *Moon*, 405 F.3d

at 379).

## III.   MEDICAL EVIDENCE[5]

Plaintiff left work because of an acute and sudden onset of shortness of breath with

minimal exertion.  Plaintiff describes it as literally losing his breath or suffocating and

also describes anxiety secondary to becoming short of breath.[6]

Dr. Ginn, Plaintiff's primary care physician, noted the following on December 28,

2009 (one-and-a-half months prior to Plaintiff's departure from work):

> He has been to a cardiologist and a pulmonologist. He has had
> chest pain completely checked out and although there is mild
> CAD, (Coronary Artery Disease) it is not considered significant.
> He has some evidence of what sounds like restrictive lung
> disease brought on by histoplasmosis scarring. He tells me he
> cannot perform any type of physical labor without getting short
> of breath. Considering the above, I am not sure whether there is

---

[5]  There are several physicians involved in Plaintiff's case: (1) Niranjan Reddy, M.D., cardiologist; (2) Narayan Peddena, M.D., gastroenterologist; (3) William Ginn, M.D., primary care physician; (4) Namita Sood, M.D., pulmonologist; and (5) Charles Walters, M.D., who completed an independent psychological review and report on Plaintiff after an in-person examination.

[6]  "I started having problems when I walk, down a flight of stairs, walking out to the front porch, the mailbox, whatever.  It seemed like I couldn't breathe and then I would have chest pains or an anxiety attack where it feels like someone was sitting on my chest.  It was hard to breathe.  It was just a weird feeling.  Then it would just go away and then all of a sudden it would pop up again and I would be walking to go to an appointment and I would be getting out of the car and I couldn't breathe and I would have the anxiety attacks, nausea, and headache, whatever came with it.  Then it would pass and it continued to happen more and more often.  When I was driving, I would have to pull over to the side of the road just to catch my breath, just to get my wits about me.  At a point, it came probably within the last year, I was really pushing to get to go to these meetings or to do anything in the yard, to take the trash out, whatever.  Sometimes it wouldn't happen, sometimes it would happen.  But it got to the point when I was meeting with clients and it would be going on and I would have to sit through it.  I would meet with them and then they would be coming in the next day to bring me $100,00.00 and I couldn't remember who they were.  I knew the name but I didn't remember meeting with them and I was fearful in making major mistakes with people's money."  (Doc. 11, Plaintiff's video statement at 6:02-8:04).

anything to add except that he is physically out of condition. He also relates an unusual abdominal symptom where it feels that something is 'under his skin' and moving about in left upper quadrant.

Plaintiff completed an Activities Questionnaire, explaining that "[a]ny time I exert on anything, whether it be walking, lifting, standing, I become tired and out of breath, pretty much exhausted. When I have any type of conflict, I have anxiety attacks and nausea. This makes my ulcers flare up." (Doc. 11 at 137).  When asked about his daily routine, Plaintiff responded, "[u]p around eight a.m., sit on a couch until about 11:00 a.m. then do something like errands, go to rehab, come home, take a nap, go in and pick up boys, come home, have dinner, sit on couch, go to bed." (*Id.*)  A more comprehensive discussion of Plaintiff's discomfort was recorded by Defendant's employee Deena Lebel: "Claimant explained that it is the shortness of breath and anxiety attacks and angina. Claimant stated it started about 18 months ago and has gotten worse." (Doc. 11 at 42). Additionally, she states:

> Cardiac rehab started 3-31-10 and will go for eight weeks every other day. He is on a tread mill with monitoring. He sees Dr. Reddy next week for follow up. Asked claimant about whether he was able to work with this what changed. Claimant stated that he had histoplasmosis when younger. Then July 2008, he thought he had a heart attack and was sent to Upper Valley and had catheter. He was told he had spastic aorta. Claimant stated he used to throw up every day before going into work but indicates that there was nothing going on at work to cause this.

> Asked claimant about testing he had yesterday and he indicated
> that he just went down to schedule an appointment with head of
> respiratory and has appointment today before cardiac rehab. He
> could not provide me with physician's name. Explained to
> claimant that claim will need medical review to clarify what if
> anything is impairing claimant at this time. We will let claimant
> know if determination is made for and if additional information
> is needed.

(Doc. 11 at 42). Within three days, Ms. Lebel referred the case to Dr. Millstein for

review.

### A.    Denial Letter

The May 13, 2010 denial letter appears to recite Dr. Millstein's report.  Dr.

Millstein pointed out the "potential" presence of "conditions," in declaring Plaintiff fit to

return to his job.  (Doc. 11 at 155, offering a theory that symptom amplification and

somatization[7] may be behind Plaintiff's anxiety, despite the fact that he never personally

examined Plaintiff).  In fact, Dr. Millstein admits that his analysis has limitations:

"Although assessment of impairments due to psychiatric conditions is outside my area of

expertise, anxiety has been a chronic condition treated with Benzodiazepines on an as

needed basis."  (*Id.*)

Dr. Millstein contacted and spoke with Dr. Peddena, Dr. Ginn, and Dr. Reddy.  At

the end of his conversation with each provider, he transmitted a letter summarizing the

---

[7] Psychiatric diagnosis applied to patients who persistently complain of varied physical
symptoms that have no identifiable physical origin.

conversation (from his perspective), and asked each provider to sign it if they agreed.[8]
Dr. Peddena signed the letter (Doc. 11 at 163), but was not treating Plaintiff for the
shortness of breath and anxiety at issue in this disability case. Additionally, Dr. Millstein
asked Dr. Ginn to sign his letter, but Dr. Ginn refused. Instead, Dr. Ginn responded with
the following letter:

> I am somewhat confused regarding this situation. When I was
> speaking with Dr. Millstein, I was unaware that our discussion
> was anything *more than a review of Dr. Millstein's*
> *interpretation* of what he had been sent by my office. I was
> definitely not aware that I would be expected to 'sign off' on
> Dr. Millstein's findings. I do not feel that I should be the
> reviewer in this situation. It is perfectly fine for Dr. Millstein to
> render an opinion and I respect his interpretation of the findings,
> but I am not willing to present the information and judge the case.

(Doc. 11 at 102). Dr. Reddy received a letter from Dr. Millstein, which he signed and
returned on or about April 22, 2010. (Doc. 11 at 106-107). However, Dr. Reddy clarified
his position on appeal, stating that he did not agree with Dr. Millstein's assessment. (*Id.*
at 533, 534).

On May 5, 2010, Defendant took the job description supplied by Plaintiff's
supervisor, and forwarded it to Defendant's certified vocational counselor, Ms. Marquez.
Ms. Marquez determined that the job of Financial Services Sale Representative is
performed two ways in the national economy: (1) at the light level, which requires more

---

[8]  These letters are on Libery Mutual letterhead and contain Dr. Millstein's telephone
number at the Liberty Life facility in Dover, New Hampshire. *See, e.g., DeGennaro v. Liberty
Life Assurance Co. of Boston*, 561 F. Supp.2d 811, 815 (W.D. Mich. 2008) ("Dr. Millstein does
not have an active patient practice, but rather works exclusively for Liberty Life.").

traveling, standing, and walking; and (2) at the sedentary level which is conducted

primarily by sitting for six hours a day, standing and walking.[9] Although the denial letter

does not so indicate, the vocational counselor noted that, "[m]ost sales representatives,

financial services…work in offices under somewhat stressful conditions, with a growing

number employed mostly by discount or online brokerage firms." (Doc. 11 at 109). Ms.

Marquez's analysis does not provide any guidance as to whether Plaintiff could perform

on an ongoing persistent full time basis, as the policy requires, nor does it take any of the

evidence in the appeal into consideration.

### B.     Plaintiff's Appeal

Plaintiff's appeal contained new medical records and reports, and clarification of

existing documents. Plaintiff obtained Dr. Reddy's opinion with regard to Plaintiff's

medical condition and current severity on June 26, 2010. (Doc. 11 at 480-536). Dr.

Reddy indicated that he has known Plaintiff as a patient for at least two years. (*Id.* at

488). He perceived his function in Plaintiff's case as a consultant and not as a primary

care physician. (*Id.* at 489). Dr. Reddy explained that with regard to Plaintiff's shortness

of breath, he usually referred all pulmonary cases to other specialists, so he referred

Plaintiff to a pulmonologist at Ohio State University. (*Id.* at 491).[10] Dr. Reddy indicates

---

[9] There is no indication that Ms. Marquez made any effort to contact Plaintiff about his job duties.

[10] At the time of Dr. Reddy's initial statement, all of the test results from the pulmonologist were pending and he admits that he was having trouble "pin-pointing the exact etiology of Mr. Niswonger's shortness of breath." (Doc. 11 at 504).

that, prior to sending Plaintiff to Ohio State University, he concluded with regard to symptomology, that:

> A predominant symptom of Sam is shortness of breath. When he gets short of breath, he also gets tightness in the chest, which we would call it chest pain. They are brief, most of the time associated with shortness of breath and he also noted palpitations when he gets this shortness of breath. And the same time he appears to be very anxious and sweaty. So all of them appear to be interrelated.

(Doc. 11 at 497).

Dr. Reddy sent Plaintiff to cardiac rehabilitation in early 2010 to help with his physical capacity. "It is a supervised exercise program which is done two or three times per week for a period of six to twelve weeks. So almost all of the patients who get stents, who get bypass surgeries, who have valve surgeries, they do go for that." (Doc. 11 at 502). With regard to the cardiac rehabilitation, Dr. Reddy agreed that it did not really improve Plaintiff's condition, and that he still suffered from the same symptoms and severity that he did after the cardiac rehabilitation was completed.[11] (Doc. 11 at 505).

Dr. Reddy was asked about his conversation with Dr. Millstein as part of Plaintiff's appeal. (Doc. 11 at 526). Dr. Reddy indicates the nature of the phone conversation between him and Dr. Millstein as follows:

---

[11] Q: So [cardiac rehabilitation] doesn't actually really demonstrate the same capacity you would use in an entire week of work; is that fair to say?
A: Yes, it is very fair.
(Doc. 11 at 505-506).

-10-

Q: But just to make sure that we're putting the conversation between you and prospectively for Dr. Millstein into its proper perspective, this would be a, no more than a few minute encounter?

A: Absolutely.

Q: You wouldn't devote like an hour?

A: No.

Q: Like you are devoting today?

A: No, no way.

(Doc. 11 at 526).

When confronted with the letter that Dr. Reddy signed and transmitted back to Dr. Millstein, Dr. Reddy said the following:

A: I will be very honest, I don't remember reading this. Of course I signed it over here. But I got to be honest and say that papers like this come quite often. My medical assistant quickly looks at it, puts it in a folder, and we just go ahead and sign them. Because I mean I will be honest, I don't think I read the whole thing.

Q: And just to be clear about it, I mean no fault, we all have a lot of stuff coming in front of us every day, you would disagree then with the conclusion offered by Dr. Millstein that Sam can return to his full-time occupation as financial advisor?

A: I disagree.

Q: And so to the extent that – I mean I really don't sense that you even said that.

A: I very much can say that I don't think I ever used that word and said that he can go back to his work as a financial advisor.

Q: So at that point, too, I guess becomes somewhat obligatory to say that if Dr. Millstein arrived at that conclusion that you offered Sam back to his full-time job, that would be a mistake or a misinterpretation on his part?

-11-

A: Yes. As I said, I mean again and previously few minutes back, as I said, I might have said that he can go back to the desk job, but I don't remember at all, and even if I said it I don't think I agree right now that he can go back as a financial advisor.

Q: When I was in college in New York City, I had a job as a security guard, and I had a desk job, and all I did was sit there and watch television and check people in. And I would imagine that's the kind of desk job that you were referring to?

A: Exactly. I mean it could be answering the phones, that's a desk job.

Q: Yes.

A: I mean as I said, that's, desk job means thousands of types of jobs. It can be the easiest job or it can be one very tough desk job.

(Doc. 11 at 527-529).

Ultimately, Dr. Reddy indicated that he disagreed with Defendant's assessment that

Plaintiff could do his job:

A: I think I really disagree with Dr. Millstein, and again I have to say it, I personally think that Sam cannot work in his – if this is his job, I mean I am getting to know that, this is what he does, it's going to be really, really hard for him to work at his job.

Q: So much that he would be eliminated from doing it?

A: Yes.

Q: Based upon your education, training, and experience as well as your treatment of Sam Niswonger and your review of your medical records as well as the records I put in front of you, do you have an opinion, within a reasonable degree of medical certainty, as to whether or not Sam Niswonger could physically perform his occupation from April 20, 2010, to current?

A: He cannot.

Q: And your answer is within a reasonable degree of medical certainty?

A: Yes.

-12-

(Doc. 11 at 533-534).

In a May 27, 2010 office visit with Dr. Reddy, Dr. Reddy reported a diagnosis of

Coronary Artery Disease with continued medical management, "Anxiety/panic attacks.

He is seeing a psychologist," histoplasmosis,[12] hypertension well controlled, and

dyslipidemia.[13] On July 2, 2010, Dr. Reddy reported, "[h]e still continues to have

significant shortness of breath. It also appears to be significantly related to anxiety . . .

The patient's general condition and his significant anxiety disorder is making him [sic]

difficult to do any significant exertional work. However, I feel that he may be able to do

desk jobs."[14]

Additionally, Defendant received the medical records of Namita Sood, M.D., a

pulmonologist. Dr. Snood reported, "I suspect that most of these [symptoms] are related

to a combination of things; his recent weight gain, his anxiety and he does have

obstructive lung disease." (Doc. 11 at 62, 749).

Plaintiff's appeal also included an August 21, 2010 evaluation by Dr. Charles

Walters, a neuropsychiatrist, to determine the severity of the anxiety. After he

interviewed Plaintiff, Dr. Walters indicated that:

---

[12] Symptoms of this infection very greatly, but the disease primarily affects the lungs.

[13] Abnormal amount of lipids (cholesterol and/or fat) in the blood.

[14] It is important to note that this appeal is reviewed under the "own occupation"
standard, meaning the Covered Person's occupation that he was performing when his Disability
began. Accordingly, Plaintiff's ability to do "desk jobs" does not translate into Plaintiff being
able to perfom his former job as a financial advisor.

> Mr. Niswonger's experiences with anxiety and panic attacks
> are significant enough that they would impair his ability to
> perform the intellectual functions associated with performing
> his job as a Stockbroker. I have no doubt that there is little room
> for error in Mr. Niswonger's occupation and it is clear to me that
> the emotional and mental disturbances that he encounters on a
> daily basis would cause a substantial limitation on his ability to
> perform his occupation as a stock broker for National City Bank
> (now known as PNC).

(Doc. 11 at 777).

The appeal also included an evaluation of the vocational components of Plaintiff's

case. A full vocational assessment was performed by Mr. Mark Pinti, a diplomate and

member of the American Board of Vocational Experts. Mr. Pinti reviewed the file and

determined that Plaintiff was "not capable of performing his job as a stock broker." Mr.

Pinti notes that:

> Although it appears possible that Mr. Niswonger could sustain
> an eight hour work day doing sedentary and light work, it is clear
> that he could not do the type of work that he performed as a stock
> broker. He does not have the stamina or ability to maintain
> attention and concentration for such a job. His frequent anxiety
> attacks render him incapable of maintaining reliable performance.
> Aside from the physical requirements of the stock broker job,
> there are non-exertional requirements as defined by the revised
> handbook for analyzing jobs: 1) influencing people in their
> opinion, attitudes, judgments about ideas or things; 2) dealing with
> people beyond giving and receiving instructions; and 3) making
> generalizations, evaluations, or decisions based upon sensory or
> judgmental criteria. Mr. Niswonger's conditions preclude him from
> those capabilities. He has diminished capability to concentrate or
> pay close attention to details. He has frequent panic attacks
> exacerbated by stressful situations. I do not believe that Mr.
> Niswonger would be capable of performing the intricate and
> stressful functions of stock broker.

(Doc. 11 at 787-788).

-14-

## IV.    ANALYSIS

### A.    Dr. Reddy's Statement

Defendant relied upon Dr. Reddy's signed letter to Dr. Millstein to support its

denial, but failed to address new evidence from Dr. Reddy correcting and clarifying his

statements about Plaintiff – specifically, that Plaintiff "can't do his job, but he would be

able to do some lower stress desk job." (Doc. 11 at 527-529).  Dr. Reddy's statements

contradict a finding that Plaintiff can return to his job as a Financial Advisor.  Dr. Reddy

concluded that a stressful environment is inappropriate for Plaintiff and his recovery. *See*

Section IIIB, *supra*.

A plan may not reject summarily the opinions of a treating physician, but must

instead give reasons for adopting an alternative opinion. *Evans v. Unumprovident Corp.*,

434 F.3d 866, 877 (6th Cir. 2006) ("[A]" plan administrator may not arbitrarily disregard

reliable medical evidence proffered by a claimant, including the opinions of a treating

physician.").[15]  Where short-term disability was paid, Defendant must demonstrate

improvement in the claimant's condition before denying access to long term disability

---

[15] *See also Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 297 (6th Cir. 2005) (plan administrator's reliance on reviewing physician's opinion to terminate benefits was arbitrary and capricious where reviewing physician "never address[ed] head-on and seemed to ignore" the contrary opinions of treating physicians).

-15-

benefits.[16] *Smith v. Aetna US Healthcare*, 312 F.Supp.2d 941 (S.D. Ohio 2004). Dr.

Reddy's finding directly contradicts Defendant's contention that Plaintiff failed to

provide proof of continued disability.[17]

## B.    Independent Psychological Evaluation by Dr. Walters

Defendant disregarded Dr. Walters' opinions because they were not consistent

with the demands of the policy as "appropriate available treatment." In sum, Defendant

indicates that it could not rely upon Dr. Walters' opinions because he "does not objectify

Mr. Niswonger's panic attacks and anxiety. Dr. Walters provided no record of objective

---

[16] Dr. Reedy made the following statement under oath:

> Q: And so would it be your medical opinion then that Sam has remained continuously disabled from April 1, 2010 to present?
>
> A: Yes.
>
> Q: And still even probably from your last visit in July, probably going out, even into the future?
>
> A: Yeah. I totally agree with you on that, that I don't see any improvement. In fact he may be getting, going the other way.
>
> Q: Now in the years that you've know Mr. Niswonger, have you found him to be truthful?
>
> A: Yes.
>
> (Doc. 11 at 30-31)

[17] Defendant's reliance on Dr. Reedy's initial statement but neglect of his later prognosis reflects a selective review of the record that has been held to be arbitrary and capricious. *See, e.g., Govindarajan v. FMC Corp.*, 932 F.2d 634 (7th Cir. 1991). In *Govindarajan*, the plan administrator terminated the claimant's disability benefits based on an isolated medical report from the claimant's treating physician suggesting that the claimant was capable of returning to work. 932 F.2d at 637. Two months later, however, the same physician concluded that further evaluation was needed before a return-to-work date could be established. The plaintiff's claim file contained evidence from other medical professionals who agreed that the claimant could not work and cited physical causes to support their opinions. *Id.* The district court reasoned that the plan administrator's "selective review of the medical evidence and its completely erroneous assertion that there was no physical cause for the subjective symptoms of pain renders its decision not only unreasonable but arbitrary and capricious. *Id.*

assessment to determine cognitive impairment such as mental status exam findings, status

test results or recommendation for neuropsychological testing." (Doc. 11 at 63).[18]

Defendant argues that there is no medical evidence to link Plaintiff's anxiety and

panic attacks to the shortness of breath.[19] However, it is not appropriate to require the

claimant to objectify that which cannot be objectified. *Pelchat v. Unum*, No. 3:02cv7282,

2003 U.S. Dist. LEXIS 8095 (N.D. Ohio Mar. 25, 2003). Moreover, Plaintiff did submit

---

[18] It is important to note that Dr. Millstein is not an attending physician and did not provide any reasoned explanation for his assessment that Plaintiff could work. Therefore, it is illogical that Defendant may use the opinion of Dr. Millstein, yet disregard the opinion of Dr. Walters. In fact, unlike Dr. Millstein, Dr. Walters had the benefit of sitting down with the Plaintiff, talking with him, and formulating an opinion from a face to face encounter.

[19] The Policy provides that: The benefit will be paid for the period of Disability if the Covered Person gives to Defendant Proof of continued:
1. Disability;
2. Regular Attendance of a Physician; and
3. Appropriate Available Treatment.

"Appropriate Available Treatment" means care or services which are:
1. generaly acknowledged by Physicians to cure, correct, limit, treat or manage the disabling condition;
2. Accessible within the Covered Person's geographical region;
3. Provided by a Physician who is licensed and qualified in a discipline suitable to treat the disabling Injury or Sickness;
4. In accordance with generally accepted medical standards of practice.

Proof is defined by the Policy as: the evidence in support of a claim for benefits and includes, but is not limited to, the following:
1. A claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits:
2. An attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and
3. The provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

(Doc. 11 at 63).

objective evidence, including a finding by Dr. Snood that "most of these [symptoms] are

related to a combination of things; his recent weight gain, his anxiety, and he does have

obstructive lung disease." Defendant's unwillingness to analyze Dr. Walters' findings is

an arbitrary and capricious act, as was recently found by this District in *Spina v. CVS*

*Corp.*, Case 1:10cv243, 2011 U.S. Dist. LEXIS 26311 (S.D. Ohio Mar. 3, 2011) (failure

to recognize symptoms preventing work was arbitrary and capricious) as well as

(administrator's failure to comment on the effect symptoms have on attention and

concentration was arbitrary and capricious).

### C. Plaintiff's Evidence on Appeal

Defendant abandoned the requirements of the Plan when it failed to have Plaintiff's

new evidence (from Dr. Sood, Mark Pinti (vocational expert), Dr. Walters, and Dr.

Reddy) properly reviewed. *See, e.g., Kalish v. Liberty Mut.*, 419 F.3d 501 (6th Cir. 2005)

(where failure to explain basis for rejection of treating physician was arbitrary and

capricious); *Patrick v. Hartford*, 543 F.Supp. 2d 770, 778 (W.D. Mich. 2008) ("lack of

objective evidence" denial is arbitrary and capricious where insurer could have asked for

exam or asked for missing data). Defendant abandoned its duty to complete a full and

fair review, by failing to explain itself in a principled and deliberate manner. *Williams v.*

*Int'l Paper*, 227 F 3d 706 (6th Cir. 2000). While administrators are not required

"automatically to accord special weight to the opinions of a claimant's physician,"

neither may they "arbitrarily refuse to credit a claimant's reliable evidence, including the

opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822,

-18-

834 (2003).

For a number of reasons, this Court finds that Defendant's benefits determination

was not based on a reasoned or rational reading of the record before it, and was arbitrary

and capricious in light of the record evidence. First, there is nothing to support a finding

that Dr. Millstein reviewed the file on appeal. The only explanation from Defendant with

respect to the appeal is a note that a decision was made by Nancy Winterer, the appeal

review consultant, to "uphold denial. Medical does not support claimant is totally

disabled own occupation." (Doc. 11 at 38-39). The administrative record indicates that

no additional reviews were performed and the only evidence of a reasoned explanation

for the denial exists in the denial letter itself. (*Id.* at 65). Second, Defendant asserts that

there is no objective data in the record to support a disability finding. However, this

conclusion is not supported by the record with verifiable objective results including a

diagnosis of obstructive lung disease and coronary artery disease.

## D. Own Occupation v. Any Occupation[20]

Defendant maintains that Plaintiff's claim must fail because he has failed to

provide any medical evidence that he was unable to do any other occupation. However,

Plaintiff is presently in the "own occupation" period of his disability policy, which will

---

[20] Pursuant to the long-term disability plan, a plan participant is eligible for benefits if he is unable to perform his occupation. After 18 months of payments under the "own occupation" clause, the terms of the "any occupation" clause come into effect. Under this provision, a plan participant is eligible for long-term disability benefits if he is unable to perform any occupation for which he is or may become qualified.

end in October 2011, at which point his "any occupation" period will begin. (Doc. 11 at

64). Defendant's denial letter very clearly and unambiguously states that "there is

insufficient medical evidence to establish that Mr. Niswonger's medical condition is of a

nature and severity that prevented him from performing the material and substantial

duties of his Sales Representative Financial Services occupation." (*Id.*) Whether

Plaintiff has chronic health problems that prevent him from working at "any occupation"

is not the issue currently before the Court.

### E.     Dr. Millstein

It appears from a review of the record that the analysis of Dr. Millstein was the

principal reason Plaintiff's benefits were denied.[21]  (Doc. 11 at 96-101).  Dr. Millstein is

an internal medicine physician, not a specialist in pulmonology or psychiatry.

The May 13, 2010 denial letter supports a finding that Dr. Millstein did not have

Plaintiff's job description when he transmitted his findings to the Defendant on April 26,

2010. (Doc. 11 at 153-158). Failure to supply Dr. Millstein with a job description was

arbitrary and capricious, because without knowing what Plaintiff's job entailed, he could

not properly author his April 26, 2010 report. The denial letter indicates, "[o]n April 30,

---

[21]  Courts have previously disfavored Dr. Millstein's opinions. In *Cusson v. Liberty Life*,
592 F 3d 215, 225 (1st Cir 2010), the Court identified Dr. Millstein as a "full time employee" of
Liberty Life and noted that his work contained inaccurate statements. *See also DeGennaro*, 561
F. Supp. 2d at 815 (Dr. Millstein misrepresented plaintiff's primary care physician in his
diagnosis of the plaintiff). Moreover, the Supreme Court has recognized that "physicians
repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in
order to save their employers money and to preserve their own consulting arrangements." *Black
& Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003).

2010, we received an email response from Katherine Foland outlining Mr. Niswonger's

job duties as Financial Advisor. Ms. Foland forwarded an official copy of Mr.

Niswonger's job description on May 4, 2010." (*Id.* at 99). Therefore, under Defendant's

recitation of the facts, Dr. Millstein conducted an improper assessment of Plaintiff's

capability to return to his job, because Dr. Millstein never even knew what Plaintiff's job

entailed. *See* 29 CFR § 2560.503-1(h)(iii).

Moreover, Defendant's decision to conduct a file review rather than a direct

examination is "just one more factor to consider in the overall assessment of whether

Liberty Life acted in an arbitrary and capricious fashion," *DeGennaro*, 561 F.Supp. 2d at

818, although there is "nothing inherently objectionable about a file review by a qualified

physician in the context of a benefits determination." *Clavert*, 209 F.3d at 289.

Nevertheless, while a "pure paper review" is not required, the court in *Calvert* held that:

> while we find that Liberty's reliance on a file review does not,
> standing alone, require the conclusion that Liberty acted
> improperly, we find the failure to conduct a physical
> examination – especially where the right to do so is specifically
> reserved in the plan – may, in some cases, raise questions about
> the thoroughness and accuracy of the benefits determination.

The Sixth Circuit held that the file review performed in *Calvert* was inadequate

because the physician did not describe the data that he reviewed in reaching his decision,

and he made credibility determinations, concerning the patient's subjective complaints,

without the benefit of a physical examination. *Calvert* at 296. "Where, as here, however,

the conclusions from that review include critical credibility determination regarding a

-21-

claimant's medical history and symptomology, reliance on such a review may be inadequate." *Id.*, 409 F.3d at 297, n.6.[22]

Here, Dr. Millstein opined that "symptom amplification and somatization" may be behind Plaintiff's anxiety – and this he concluded despite never having met or examined Plaintiff. *See also Helfman v. GE Group Life Assurance Co.*, 573 F.3d 383 (6th Cir. 2009) (credibility determination about a claimant made without a physical exam supports a conclusion that the decision was arbitrary).[23]

Furthermore, "we must take into consideration the fact that Defendant is acting under a potential conflict of interest because it is both the decision-maker, determining which claims are covered, and the payor of those claims." *Calvert*, 409 F.3d at 292. "The conflict of interest at issue should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Metro Life Ins. v. Glenn*, 554 U.S. 105, 126 (2008). On the other hand, the conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Id. See also Degennaro*, 561 F. Supp. 819 ("the Court

---

[22] Similarly, upon administrative review in *Calvert*, the reviewer found that "there were no objective or clinical findings which support any restriction." *Id.*

[23] There is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physican. However, where the conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate.

recognizes Liberty Life's inherent conflict of interest and considers it as a factor in this arbitrary and capricious review").

It is against this backdrop that this Court must determine whether Defendant acted arbitrarily and capriciously in denying further disability benefits to Plaintiff. Upon consideration of Dr. Millstein's file review, and his conclusions contrary to the objectively verifiable determinations of Plaintiff's treating physicians, and upon further consideration of Defendant's conflict of interest, the Court finds that Defendant acted arbitrarily and capriciously and that the decision denying long-term disability benefits to Plaintiff must be reversed.

## V. CONCLUSION

The evidence in the record overwhelming establishes Plaintiff's inability to do his job. Accordingly, for the reasons stated above, the Court concludes that the plan administrator's decision to terminate Plaintiff's long-term disability benefits was not the product of a deliberate principled reasoning process and, therefore, was arbitrary and capricious. Therefore:

1. Plaintiff's motion for judgment as a matter of law (Doc. 14) is **GRANTED**;

2. Defendant's motion to deny relief and affirm the administrative decision (Doc. 13) is **DENIED**;

3. Judgment is **ENTERED** in favor of Plaintiff awarding him long term disability benefits and the matter is **REMANDED** to the plan administrator with instructions to award Plaintiff long-term disability benefits retroactive to April 21, 2010; and

4.      This case is **CLOSED**.

**IT IS SO ORDERED.**

Date:  ___8/3/11___                                          _Timothy S. Black_
                                                            Timothy S. Black
                                                            United States District Judge